IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| EMILY ORBISON | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No: 3:25-cv-1163 |
| | ) | |
| v. | ) | |
| | ) | Judge: Trauger |
| WILLIAMSON COUNTY SCHOOLS, | ) | |
| | ) | |
| JASON GOLDEN, | ) | |
| SUPERINTENDENT OF | ) | |
| WILLIAMSON COUNTY SCHOOLS, | ) | JURY DEMAND |
| In both his personal and | ) | |
| official capacities. | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff, through undersigned counsel, submits this memorandum in support of Plaintiff's **Motion For Temporary Restraining Order and Preliminary Injunction**. Plaintiff would show:

### I. INTRODUCTION AND FACTUAL BACKGROUND

This lawsuit seeks redress for Defendants' ongoing violation of Ms. Orbison's First Amendment free speech rights, her 14th amendment fundamental parental rights, and her Tennessee statutory fundamental parental rights. Defendants' unlawful and draconian retaliation was triggered solely by a single act of private political speech – an Instagram "story" posted to Ms. Orbison's private, "friends-only" feed satirizing the political position on gun control espoused by the late right-wing activist and podcaster, Mr. Charlie Kirk. (Ex. A, Orbison Declaration).

Defendants' unlawful retaliation against Plaintiff comes in three forms – suspension of her employment as a teacher without pay, a broad "no contact" prohibition forbidding her from communicating with WCS staff or students in her capacity as a WCS teacher, and a broad "no

contact" prohibition forbidding her from communicating with WCS staff or students in her capacity as the mother of a WCS kindergarten student. *Id.*; (Ex. B, Suspension Letter).

Ms. Orbison asks the Court to enter a Temporary Restraining Order ("TRO"), to be followed after a hearing by a preliminary injunction, to put an immediate stop to one aspect of Defendants' unlawful retaliation – the prohibition on Ms. Orbison having any contact with WCS staff, students, or property in her capacity as the mother of a WCS kindergartener.

Ms. Orbison is the mother of a 5-year-old daughter who attends kindergarten at a WCS school. (Ex. A, Orbison Declaration). Prior to Defendants' September 15, 2025 "no contact" prohibition, Ms. Orbison was actively engaged in her daughter's school life. *Id.* Ms. Orbison volunteered regularly at the school, and planned to continue to do so. *Id.* Ms. Orbison had RSVP'd for her daughter's school's September 17, 2025 parent-reader training, and planned to attend. *Id.* Ms. Orbison had planned to take her daughter to the school's September 19, 2025 fall festival. *Id.* Ms. Orbison had planned to attend her daughter's September 24, 2025 parent-teacher conference in person. *Id.* Ms. Orbison had planned to participate in her daughter's first school book fair, scheduled September 25, 2025. *Id.* Ms. Orbison had planned to serve as a volunteer on her daughter's October 21, 2025 school field trip. *Id.*

However, Defendants' suspension notice and "no contact" prohibition changed everything. Defendants' letter read, in relevant part:

> **You are not to be on the campus of any Williamson County Schools property, attend any Williamson County Schools events, or communicate with any Williamson County School students or employees, without specific authorization by [Assistant Superintendent of Human Resources] Vickie Hall or myself during this suspension. Such contact may interfere with the investigation into these allegations and will constitute insubordination.**

(Ex. B, Suspension Notice).

Defendants' letter was initially explained to Ms. Orbison on September 15, 2025 by WCS Human Resources ("HR") Administrative Assistant McWilliams, who explained that the "no contact" restriction did indeed apply to Ms. Orbison's capacity as a mother of a WCS student. *Id.* Ms. McWilliams specified that the "no contact" restriction did in fact prohibit Ms. Orbison from speaking with her daughter's teacher, and that if she had any message she felt that she needed to communicate to the teacher she would need to get prior approval from HR for the specific desired message. Ms. McWilliams further clarified that while Ms. Orbison could still drop off and pick up her daughter at school by using the "car line," she could not enter the school for any reason. *Id.*

The next day, September 16, 2025, Ms. Orbison appeared at HR's insistence for an investigative interview. This interview was conducted by HR Senior Investigator Brian Findlen, who again clarified that the "no contact" prohibition did also apply to Ms. Orbison in her capacity as a mother of a WCS kindergartener. *Id.*

Because of Defendants' retaliatory "no contact" prohibitions, Ms. Orbison had to suddenly step back from being an active participant in her daughter's education, school events, and school community. Thus, because of Defendants Ms. Orbison missed her daughter's fall festival. *Id.* She missed the parent-reader training that she had planned to attend. She was only allowed to participate in her daughter's parent-teacher conference via videoconference. *Id.* She missed being able to take her daughter to her first school book fair. *Id.* She is forbidden from having contact with her daughter's school friends. *Id.* And unless something changes, Ms. Orbison will miss being able to serve as a volunteer for her daughter's October 24, 2025 field trip. *Id.*

While Defendants' agents initially suggested that the WCS disciplinary proceedings would likely be resolved within two weeks, as of the October 13, 2025 filing of this motion they remain pending indefinitely. *Id.* Under WCS policy and Tennessee state law, such proceedings can take

as many as ninety days. WCS Policy 5.201; T.C.A. § 49-5-511(a)(3). Thus, as it stands Ms. Orbison faces the prospect of remaining under Defendants' "no contact" for almost the entire first semester of her daughter's kindergarten program. (Ex. A, Orbison Decl.).

All of this is because of an Instagram "story" that Ms. Orbison posted on her personal time, her personal device, with her personal account, to her personal list of Instagram "friends." *Id.*; (ECF 1, Complaint, at ¶ 84). A "story" that is fundamentally political in nature, in which Ms. Orbison satirized the belief espoused by the late Charlie Kirk, and by many others on the political right, that it is "worth it" for America to endure an endless stream of seemingly arbitrary school shooting deaths for the sake of having an "armed citizenry." Ms. Orbison's "story" took the form of satire, an ancient tradition that has been used to express political critique since antiquity. Voltaire, Jonathan Swift, Mark Twain, George Orwell – the list goes on. *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019) (recognizing "our nation's long-held First Amendment protection for parody"); *also Hustler Magazine v. Falwell*, 485 U.S. 46, 54 – 55 (1988) ("Despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate.")

Mr. Kirk's position that shootings are "worth it" espoused the view that the lives of teachers like Ms. Orbison, students like Ms. Orbison's students, and kindergarteners like Ms. Orbison's daughter are an acceptable price to pay for the alleged virtues of maintaining an "armed citizenry." Kirk further asserted that this "armed citizenry" is necessary in order for Americans to protect their other, "God-given rights." With one of those "God-given rights" apparently being a Biblically-sourced male "right" to dominate women, one can perhaps begin to understand the fear and anger that fueled Ms. Orbison's Instagram parody of Mr. Kirk's claims

that shootings are "worth it." *E.g.*, Timothy 2:12 ("I do not permit a woman to teach or have authority over a man; she must be quiet."); The Charlie Kirk Show, Aug. 26, 2025 ("Submit to your husband, Taylor! You're not in charge.").[1]

In any event, whether one is sympathetic to Ms. Orbison's perspective on Mr. Kirk's views or not, the First Amendment protects her political parody - and prohibits governmental actors like Defendants from retaliating against her for it. Ironically, even Kirk himself would seem to have agreed with this, as he routinely made clear in his public pronouncements. Thus, as Kirk posted as "X" in 2024, "Hate speech does not exist legally in America. There's ugly speech. There's gross speech. There's evil speech. And all of it is protected by the First Amendment."[2]

## II. ARGUMENT

Defendants' tripartite battery of retaliation is a gross violation of Ms. Orbison's rights in all respects. However, this motion focuses only on terminating Defendants' "no contact" prohibition on Ms. Orbison in her capacity as the mother of a five-year-old WCS kindergarten student. Because of Defendants' unlawful retaliation, Ms. Orbison and her family have suffered and continue to suffer ongoing irreparable injury. Defendants are prohibiting Ms. Orbison from meaningfully participating in her daughter's education, school events, and school community. Under Fed. R. Civ. P. 65, a temporary restraining order and preliminary injunction are appropriate to stop Defendants from this particularly irreparable form of illegal retaliation.

---

[1] Available at: https://www.mediamatters.org/charlie-kirk/charlie-kirk-tells-taylor-swift-submit-your-husband-and-have-ton-children.
[2] Available at: https://x.com/charliekirk11/status/1786189687260103119.

## A. The Rule 65 Requirements

Plaintiff seeks a temporary restraining order ("TRO") and preliminary injunction pursuant to Fed. R. Civ. P. 65. In determining whether to grant a TRO and/or preliminary injunction, the Court must weigh four factors:

(1) the movant's chances of succeeding on the merits;

(2) if the movant would likely be permanently harmed absent the injunction;

(3) whether the injunction would cause substantial harm to third parties; and

(4) whether the injunction would serve the public interest.

*McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018); *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). The Sixth Circuit has held that "[n]one of these factors is a prerequisite to injunctive relief," rather, "It's a balance of four factors, not a mandate that all four factors exist. While the absence of one factor—say harm to a moving party—may weigh heavily in the balance, it does not dictate the balance." *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017). However, particularly in the context of TRO requests courts should generally emphasize the "irreparable injury" factor above the others. *Bobay v. Wright State Univ.*, 2023 U.S. LEXIS 14825, *6 – 7 (6th Cir. 2023).

## B. Ms. Orbison will prevail on the merits

Ms. Orbison brings three claims pertinent to Defendants' interference with her role as the mother of a WCS kindergarten student – a First Amendment retaliation claim, a Fourteenth Amendment parental rights claim, and a Tennessee Code Annotated § 36-8-103 parental rights claim. (ECF 1, Complaint, at 26 – 28). Ms. Orbison stands to prevail on all three claims.

1. **Ms. Orbison will prevail on her First Amendment Claim**

Although public employees must accept some limitations on their First Amendment rights as a condition of government employment, they do not surrender them altogether. Rather, governments and state actors are prohibited from retaliating against public employees for private political speech regarding matters of public concern unless the governmental adverse action is adequately justified. *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019). Thus, in analyzing Ms. Orbison's claim the court must consider:

1) Did Ms. Orbison speak on a matter of public concern?
2) Did Ms. Orbison speak as a private citizen or public employee?
3) Do Defendants have an adequate justification for treating Ms. Orbison differently from other members of the public?

*Id.*

a. **Ms. Orbison spoke on a matter of public concern**

The first of these questions is easily answered in the affirmative. Ms. Orbison's post was a satirical critique of Kirk's expressed position that shooting deaths are "worth it" for the benefit of having an armed citizenry. This is, of course, a quintessential matter of public concern. *Id.* ("Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.") (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014)). Indeed, even if one were to misinterpret Ms. Orbison's post as if Ms. Orbison had in fact endorsed the shooting of Mr. Kirk, as *The Federalist* and several WCS Board Members seem to have, it would *still* be a matter of public concern because it would still pertain to a "subject of legitimate news interest." *Id.*; *Hardy v. Jefferson Cmty. College*, 260

F.3d 671, 678 – 682 (6th Cir. 2001) (holding that professor's use of "racially vulgar language" in class was a matter of public concern because the words were germane to the subject matter being taught). Of course, as any fool can see this is *not* what Ms. Orbison intended – rather, she was lamenting the epidemic of seemingly endless school shootings in this country, and the obstinate refusal of many of those on the political right – including Mr. Kirk – to compromise on gun control to try to solve this problem. *Novak*, 932 F.3d at 427 – 428 ("[P]arody need not spoil its own punchline by declaring itself a parody"). Regardless, however one interprets Ms. Orbison's post, it obviously pertained to a matter of "public concern."

### b. Ms. Orbison spoke as a private citizen

Second, Ms. Orbison obviously spoke as a private citizen rather than as a public employee. *Buddenberg*, 939 F.3d at 739 – 740 ("the critical question … is whether the speech at issue is itself ordinarily within the scope of an employee's duties…."). Ms. Orbison posted her Instagram "story" on her private account, on her personal device, from her home, during her time off, and to a feed that only about 400 Instagram "friends" could access. (Ex. A, Orbison Decl.). She did not in any way represent the post as reflecting the views of WCS – she spoke only as herself. Thus, Ms. Orbison obviously spoke as a private citizen rather than as a public employee.

### c. Defendants cannot justify infringing Ms. Orbison's parental rights

Third, Defendants have no real justification for infringing Ms. Orbison's rights as a *mother*.[3] Thus, whatever sanctimonious proclamations some WCS Board Members and officials might wish to make about the propriety of having a teacher with Ms. Orbison's political views teaching Franklin High School students, no one can seriously contend that a WCS *parent* can be

---

[3] Plaintiff is not in any way suggesting that Defendants' actions are justified *vis a vis* Ms. Orbison's role as a teacher. However, because this motion pertains only to Ms. Orbison's role as a mother of a WCS kindergarten student, Defendants' potential justifications are assessed only in that context.

cut off from the WCS school community simply for her speech. Here, Defendants are exploiting the leverage they have over Ms. Orbison as an employee to punish her as a mother – a punishment that, inevitably, also has the incidental effect of punishing Ms. Orbison's daughter. If Ms. Orbison speaks to her daughter's kindergarten teacher without HR's prior approval, she will be fired. If Ms. Orbison sets foot in her daughter's school, she will be fired. If Ms. Orbison shows up for a school event, she will be fired. If Ms. Orbison speaks to a WCS student – which necessarily would include her daughter's school friends – she will be fired. (Ex. A, Orbison Declaration).

This outrageous infringement of Ms. Orbison's private parental rights is not justifiable, however one interprets Ms. Orbison's post. *E.g. Rankin v. McPherson*, 483 U.S. 378, 381-82 (1987) (holding that in the wake of President Ronald Reagan assassination attempt, public employee was protected by the First Amendment for saying "shoot, if they go for him again, I hope they get him."). Indeed, even within the community of Ms. Orbison's "MAGA" detractors it does not appear that there has been a call for her to be banned from communicating with WCS staff or students in her capacity as a *mother*.

    d. **Ms. Orbison will prevail on her First Amendment claim**

As articulated herein, particularly with regard to Defendants' retaliation against Ms. Orbison's role as a mother, Ms. Orbison's First Amendment claim meets all the requirements to prevail. Thus, Plaintiff will prevail on her First Amendment retaliation claim.

    2. **Fourteenth Amendment Parental Rights claim**

Likewise, Ms. Orbison is likely to prevail on her Fourteenth Amendment parental rights claim. Defendants' "no contact" order substantially burdens Ms. Orbison's right to the "care, custody, and control" of her daughter, which has been recognized as "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Troxel v. Granville*, 530 U.S.

9

Case 3:25-cv-01163   Document 7   Filed 10/13/25   Page 9 of 14 PageID #: 61

57, 65 (2000). This liberty interest has been specifically recognized to include "the right to direct the upbringing and education of children under their control." *Id.* While this right is not absolute, Defendants have no compelling governmental interest to justify prohibiting Ms. Orbison from having contact with WCS staff or students as a mother – indeed, as discussed *supra* there is no cognizable justification for it at all. *Id.* Therefore, Ms. Orbison is likely to prevail on this claim.

3. **T.C.A. § 36-8-103 Claim**

In 2024, Tennessee enacted T.C.A. § 36-8-103, entitled "Parents' Fundamental Rights." This statute protects and preserves Ms. Orbison's rights as a mother *vis a vis* WCS in several respects, such as "The right to direct the … education of [her] child….", the right "[T]o make reasonable choices within public schools for the education of the child," and the right "To participate in parent-teacher associations and school organizations that are sanctioned by the board of education of a local education agency." T.C.A. §§ 36-8-103(a), 36-8-103(c)(5) – (8).

Although there is at present no appellate case law interpreting this recently-enacted statute, Defendants' actions violate these statutory protections on their face. *Id.* Moreover, Defendants are once again woefully short of being able to assert the kind of "compelling governmental interest of the highest order" needed to justify these infringements. T.C.A. § 36-8-103(b). Therefore, Ms. Orbison is likely to prevail on this claim as well.

C. **Ms. Orbison is suffering irreparable injury**

In the context of an ongoing First Amendment injury, there is substantially less onus on a plaintiff to demonstrate actual irreparable injury in order to satisfy Rule 65. *In re King World Productions, Inc.*, 898 F.2d 56, 59 (6th Cir. 1990) (recognizing that "even minimal interference with first amendment freedoms causes an irreparable injury."). However, in this particular case

it is easy to see that Defendants are inflicting significant irreparable injury on Ms. Orbison and her family through Defendants' interference with Ms. Orbison's role as a mother.

Ms. Orbison is a very involved mother of a very young child – a child who cannot be expected to comprehend why her mother is suddenly not allowed to enter her school, talk to her teacher, take her to school functions, or even talk to her friends. (Ex. A, Orbison Declaration). Even now, Ms. Orbison and her daughter cannot get back the experiences that Ms. Orbison has already missed out on – taking her daughter to the fall festival, taking her daughter to the book fair, and attending her daughter's parent-teacher conference in person rather than via videoconference. *Id.* Ms. Orbison cannot get back the opportunities she has missed, and continues to miss, to build relationships with her daughter's school friends and their families – the birthday parties, the play dates, the gatherings. *Id.* If the prohibition continues much longer, Ms. Orbison will not be able get back the missed opportunity to serve as a volunteer on her daughter's first kindergarten field trip. *Id.* Indeed, with WCS having up to 90 days to maintain this suspension without resolving it, Ms. Orbison faces the potential prospect of being forced to sit on the sidelines of her daughter's entire first semester in kindergarten. WCS Policy 5.201.

Forcing Ms. Orbison to miss the opportunity to be part of her daughter's formative school experience harms Ms. Orbison, her daughter, and their whole family. Money can never really compensate this injury – the only solution is to stop Defendants from continuing to inflict it.

### D. The TRO/Preliminary Injunction will not harm third parties

None of the public condemnations of Ms. Orbison have seriously attempted to claim that WCS *parents* can be compelled to display empathy for Charlie Kirk[4] and his supporters on pain of being banned from WCS property, staff, and/or students. Thus, there is no reason to believe

---

[4] Of course, Kirk himself expressed utter contempt for the concept of empathy, publicly referring to it as a "made up, new age term that – does a lot of damage."

that enjoining Defendants to permit Ms. Orbison to exercise her rights as the mother of a WCS kindergarten student will harm anyone.  Defendants' letter claims that contact with WCS staff or students "may interfere with the investigation into these allegations," however, one strains to see how a high school teacher's interactions with a kindergarten teacher and her daughter's kindergarten classmates in her capacity as a mother would somehow "interfere" with the investigation of her Instagram post.  (Ex. B, Suspension Letter). Moreover, even if Defendants were to claim that Ms. Orbison's active participation in her daughter's school life would inflict some sort of emotional pain on the rest of the WCS community for having to suffer the existence of a fellow WCS parent that they find offensive, this type of nebulous, speech-based emotional pain cannot be recognized as a cognizable "harm" without tacitly abrogating the First Amendment.  *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (recognizing that "where obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression.") (quoting *Carey v. Population Services, Int'l*, 431 U.S. 678, 701 (1977)). Thus, no legally cognizable harm to third parties is at issue here.

      **E.  The TRO and injunction will serve the public interest**

As evidenced by the passage of T.C.A. § 36-8-103, it is in the public interest for Ms. Orbison to be able to exercise her fundamental parental rights in the context of her daughter's public kindergarten education.   Moreover, the public interest is always served when the Constitution is upheld.  *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). Therefore, the TRO and injunction will serve the public interest.

### F. Ms. Orbison should be excused from posting bond

Because of the nature of the non-financial nature of the TRO and injunction requested by Plaintiff, Defendants will not incur significant financial costs from them. Therefore, Plaintiff should be excused from posting a bond. Fed. R. Civ. P. 65.

### CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that her motion for temporary restraining order be immediately granted, and that the Court subsequently issue a preliminary injunction after Defendants have had the opportunity to be heard.

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Brentwood, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: Kyle@relentlesslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **October 13, 2025**, **Plaintiff's Memorandum of Law in Support of Motion for TRO and Preliminary Injunction** was filed electronically with the Court's electronic filing system. Notice of this filing will be electronically served by operation of the Court's electronic filing system.

Counsel for Plaintiff will also serve the following parties via USPS First Class Mail:

- Williamson County Schools
  C/O Superintendent Jason Golden
  1320 West Main Street
  Franklin, TN 37064

- Jason Golden
  1320 West Main Street
  Franklin, TN 37064

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953